COURT OF APPEALS
DECISION
DATED AND FILED

December 27, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP36**

**STATE OF WISCONSIN**

Cir. Ct. No.  2022CV443

**IN COURT OF APPEALS
DISTRICT II**

WISCONSIN VOTER ALLIANCE AND RON HEUER,

   PETITIONERS-APPELLANTS,

V.

KRISTINA SECORD,

   RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Walworth County: DAVID W. PAULSON, Judge. *Reversed and cause remanded for further proceedings.*

Before Neubauer, Grogan and Lazar, JJ.

¶1    LAZAR, J.  Wisconsin Voter Alliance and Ron Heuer (collectively referred to as WVA) appeal the dismissal of their petition for a writ of mandamus directed to Kristina Secord, the Walworth County Register in Probate, seeking to

obtain Notices of Voter Eligibility containing information that is statutorily required to be communicated and widely disseminated to local officials or agencies throughout the State. *See* WIS. STAT. § 54.25(2)(c)1.g. (2021-22).[1] Pursuant to direction of the Wisconsin Court System (Court System) by its Director of State Courts, that statutory mandate is accomplished by sending all the information to the Wisconsin Elections Commission (WEC) for compilation and then WEC provides the information to the local election officials or agencies. Secord contends that, because the documents sought are confidential and not subject to public disclosure and/or because WVA has not demonstrated any need for the information, the circuit court did not err when it protected the privacy and sensitive information of individuals declared incompetent and that it appropriately exercised its discretion by dismissing WVA's petition.

¶2 WVA's arguments raise two issues: (1) is the ineligibility voting determination "pertinent to the finding of incompetency," and, if so, has WVA demonstrated "a need for the information" sufficient to warrant release of the documents and/or information even if it is "pertinent to the finding of incompetency," and (2) is the Notice sent to election officials with the court's determination that a person is not competent to register to vote or to vote subject to disclosure under the Public Records Law.

¶3 WVA has filed multiple requests to other Wisconsin county clerks of court and has filed other petitions for writ of mandamus. At least one other circuit court case has been appealed. Another district of the court of appeals has issued

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

an opinion that addresses the first issue (with respect to the definition of "pertinent to the finding of incompetency"),[2] and as a unitary court, we are bound by that opinion's decision[3] to the extent it is not distinguishable.[4] *See State v. Olson*, 2019 WI App 61, ¶¶15-19, 389 Wis. 2d 257, 936 N.W.2d 178. We, however, disagree with the *Reynolds* court's conclusion on the first issue, and absent the

---

[2] *See Wisconsin Voter Alliance v. Reynolds*, 2023 WI App 66, ¶¶20-34, ___ Wis. 2d ___, ___ N.W.2d ___. As of this writing, the recommendation for publication has just been approved. This court did not lightly forge ahead before publication; it is releasing this opinion because it is appropriate and separate from that in *Reynolds*.

The procedural posture of *Reynolds* is distinguished from that in this appeal. In *Reynolds*, the Juneau County Register in Probate filed a motion to dismiss the petition for writ of mandamus on August 22, 2022, based upon WVA's failure to comply with WIS. STAT. § 801.02(5), asserting that there was a lack of jurisdiction, insufficiency of process, and/or insufficiency of service of process. As an alternative, Reynolds contended that WVA failed to state a claim upon which relief could be granted. Two days later, without waiting for a response from WVA, the circuit court issued a decision and order, dismissing the writ on the merits and with prejudice. The *Reynolds* court did not have the benefit of a fully briefed, fully argued underlying case. While the appeals may have started on the same track, their paths diverged, and each was presented differently.

The dissent also makes note that WVA had not filed a petition for review of the *Reynolds* opinion. *See* Dissent at n.2. That is neither here nor there and has no impact on the state of the law nor on the viability of our opinion.

[3] This practice is more fully explained in *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 247 (1997) as follows:

> If the court of appeals is to be a unitary court, it must speak with a unified voice. If the constitution and statutes were interpreted to allow it to overrule, modify or withdraw language from its prior published decisions, its unified voice would become fractured, threatening the principles of predictability, certainty and finality relied upon by litigants, counsel and the circuit courts. Further, with the ability to rely on the rules set out in precedent thus undermined, aggrieved parties would be encouraged to litigate issues multiple times in the four districts.

[4] The dissent asserts that this majority opinion's chief flaw is its very existence. *See* Dissent, ¶71. While the *very same records* sought by WVA are at issue in *Reynolds* and this appeal, that is neither dispositive nor a basis upon which to avoid ruling on an issue previously not decided. The question is whether the issues vary. And they do. At no point is the unified voice of this court fractured by this opinion.

*Reynolds* decision, we would have issued an opinion agreeing with WVA on the first issue. Our analysis of that issue is set forth in the attached concurrence.

¶4 We hold that if the voter ineligibility determination is, in fact, pertinent to the finding of incompetency, WVA has not only demonstrated a need for this information but has demonstrated that it is entitled to the requested Notices (in full or redacted form) pursuant to the Public Records Law.[5] WVA has, therefore, met all of the prerequisites to support its petition for a writ of mandamus.

---

[5] This majority opinion does not "upend" the Public Records Law; it lets the "sun shine" in. *See* **Schill v. Wisconsin Rapids Sch. Dist.**, 2010 WI 86, ¶2, 327 Wis. 2d 572, 786 N.W.2d 177 ("Open records and open meetings laws, that is, 'Sunshine Laws,' 'are first and foremost a powerful tool for everyday people to keep track of what their government is up to.... The right of the people to monitor the people's business is one of the core principles of democracy.'" (quoting Editorial, *Shine Light on Public Records,* Wis. State J., Mar. 14, 2010, at B1)). "The legislature has declared that we are dedicated to preserving an open and transparent government." **State v. Beaver Dam Area Dev. Corp.**, 2008 WI 90, ¶2, 312 Wis. 2d 84, 752 N.W.2d 295.

Nor is the majority opinion "all hat and no cattle," *see* **Madison Teachers, Inc. v. Scott**, 2018 WI 11, ¶40, 379 Wis. 2d 439, 906 N.W.2d 436 (Ann Walsh Bradley, J., dissenting); it reaffirms Wisconsin's longstanding goal of transparency and a "presumption of open access to public records," *id.*, ¶17 (quoting **Osborn v. Board of Regents of Univ. of Wis. Sys.**, 2002 WI 83, ¶13, 254 Wis. 2d 266, 647 N.W.2d 158).

As explained by our supreme court in **Milwaukee J. Sentinel v. City of Milwaukee**, 2012 WI 65, ¶4, 341 Wis. 2d 607, 815 N.W.2d 367:

> Wisconsin's commitment to open, transparent government rings loud and clear in the Public Records Law. The Law reaffirms that the people have not only the opportunity but also the right to know what the government is doing and to monitor the government. The legislature has explicitly provided that "all persons are entitled to the greatest possible information regarding the affairs of government"; mandated that the Public Records Law "be construed in every instance with a presumption of complete public access"; and declared that the "denial of public access generally is contrary to public interest, and only in an exceptional case may access be denied." WIS. STAT. § 19.31.

¶5     Accordingly, we reverse the circuit court's order dismissing WVA's petition for writ and remand this matter for further proceedings consistent with this opinion.

## BACKGROUND

¶6     WVA sent an official request for public records to Secord on June 28, 2022, after a previous request and some correspondence between the parties. WVA sought information about wards under guardianship in Walworth County, specifically the names, addresses, birth dates, and "a copy of all wards under guardianship in [the] county." On July 26, 2022, WVA clarified[6] that it was seeking completed GN-3180 forms from 2016 to the present and information regarding guardianship of wards without voting rights for the same time period.

¶7     The requested forms[7] are "Notices of Voting Eligibility," which indicate that a circuit court has found a person incompetent to exercise the right to vote or restored a person's right to register or vote. The forms themselves identify the "Wisconsin Elections Commission" as the agency to which these notices should be sent. *See also* WIS. STAT. § 54.25(2)(c)1.g. ("The determination of the court [that a person is ineligible to vote due to incompetency] shall be

---

[6] This also distinguishes this appeal from that in ***WVA v. Reynolds***, because the Juneau County Circuit Court did not allow WVA an opportunity to refine its request or to explain or defend its petition. *See **Reynolds***, ___ Wis. 2d ___, ¶¶12-13. Contrary to the dissent's argument at ¶75, WVA's ability to present its arguments in carefully composed, detailed, written appellate briefs is far afield from a summary explanation set out in a short email.

[7] The Notice of Voting Eligibility (Form No. GN-3180) (as well as the Determination and Order on Petition for Guardianship Due to Incompetency (Form No. GN-3170), the underlying court order that finds a person incompetent) are templates created by the Consolidated Court Administration Programs (CCAP), which provides computer automation to the Wisconsin court system. Wisconsin Court System, Administrative Structure of the Courts (Nov. 2022), https://www.wicourts.gov/courts/resources/docs/structure.pdf.

communicated in writing by the clerk of court to the election official or agency charged … with the responsibility for determining challenges to registration and voting ….").[8] According to WEC, if and when it receives such a notice (and when the notice includes sufficient information to identify a specific voter), it adds the person to a list of disqualified voters that it publishes to local clerks, who perform inactivation of voter registrations for such persons. That inactivation—or lack thereof—is subject to public challenge. *See* WIS. STAT. § 6.48(3).

¶8    WEC also administers a public database called WisVote that includes information about all voters in Wisconsin. This information, available to any member of the public pursuant to Wisconsin's Public Records Law, WIS. STAT. §§ 19.31-.37, includes each voter's name, address, voter status, and "Voter Status Reason." Sometime in 2022, WEC changed the "Voter Status Reason" for a voter who had voting rights revoked due to a finding of incompetency from "incompetent" to "administrative action."[9]

¶9    WVA's stated goals are "to improve the government's accuracy in the WisVote database so that the court orders restricting the voting rights of the

---

[8] The statutory mandate directs clerks of court to disseminate the forms to the appropriate county and municipal clerks or officials throughout the entire state and the Wisconsin Court System has put in place a procedure to better coordinate the fulfillment to that statutory mandate. There are 72 counties, 1,245 towns, 190 cities and 415 villages (a total of 1,850 municipalities not including counties). *See* 2023-24 Wisconsin Blue Book, Local Governments in Wisconsin, at 1, 2 and 4. (https://docs.legis.wisconsin.gov/misc/lrb/blue_book/2023_2024/090_local_government_in_wisconsin.pdf). By requiring that the forms be sent to WEC (as is noted on the very face of the form) and directing that WEC provide that information to the designated statutory recipients, the Wisconsin Court System is complying with the statute. This procedure is further evidence that the information on the Notice of Voting Eligibility forms is not inherently confidential due to the legislature's intent that such information could be received by any of over 2,000 county and municipal clerks, and their employees and staff.

[9] It is unclear why the WEC made the change in terminology.

wards are honored" and "to protect wards under 'no vote' guardianship orders from abuse." On the same day it made its official request for records to Secord, it filed a petition for mandamus in Walworth County Circuit Court seeking a writ directing Secord to produce the requested documents.[10] WVA asserted that the requested information is "already intended to be publicly available" and that to the extent WIS. STAT. § 54.75 applied, its request fell under the exception to the confidentiality requirement therein. This statute provides:

> All court records *pertinent to the finding of incompetency* are closed but *subject to access* as provided in [WIS. STAT. §] 51.30 or 55.22 or *under an order of a court* under this chapter. The fact that an individual has been found incompetent and the name of and contact information for the guardian is accessible to any person who demonstrates to the custodian of the records a need for that information.

§ 54.75 (emphasis added).

¶10 After a hearing, the circuit court granted Secord's motion to dismiss, finding that WVA had no "clear legal right to access guardianship information," "the confidentiality of [WIS. STAT. §] 54.75 extends to 'All court records' including GN-3180" and "the **completed** form GN-3180 is a confidential record and not a public document." WVA appeals, conceding it is not entitled to actual guardianship court orders and seeking reversal only with respect to "redacted Notices [with] sufficient information … to identify the person with publicly available WisVote data on that same person."

---

[10] As noted above, this type of request was also filed in other counties, and WVA has filed other petitions for writ of mandamus where the requests were denied.

**STANDARD OF REVIEW**

¶11 We will uphold the denial of a petition for a writ of mandamus "unless the [circuit court] erroneously exercised discretion." *Lake Bluff Hous. Partners v. City of S. Milwaukee*, 197 Wis. 2d 157, 170, 540 N.W.2d 189 (1995). That discretion "is erroneously exercised if based on an erroneous understanding of the law." *State ex rel. Zignego v. WEC*, 2021 WI 32, ¶38, 396 Wis. 2d 391, 957 N.W.2d 208 (quoting *Lake Bluff Hous. Partners*, 197 Wis. 2d at 170).

¶12 In order to determine whether there was an erroneous exercise of discretion in this appeal, this court must look to the applicable statutes. Questions involving statutory interpretation are reviewed de novo. *Reyes v. Greatway Ins. Co.*, 227 Wis. 2d 357, 364-65, 597 N.W.2d 687 (1999); *see also State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶¶44-51, 271 Wis. 2d 633, 681 N.W.2d 110. Even with a de novo review, we can still "benefit[] from the analysis of the [circuit] court." *State ex rel. Rupinski v. Smith*, 2007 WI App 4, ¶13, 297 Wis. 2d 749, 728 N.W.2d 1 (2006). Moreover, "[t]he application of the [Public] Records Law to undisputed facts is a question of law that [the appellate] court reviews de novo." *Zellner v. Cedarburg Sch. Dist.*, 2007 WI 53, ¶17, 300 Wis. 2d 290, 731 N.W.2d 240.

¶13 WVA's petition for writ of mandamus was dismissed, pursuant to Wis. Stat. § 802.06(2)(a)6., for a failure to state a claim upon which relief could be granted. A circuit court's dismissal order is reviewed independently. *State ex rel. Greer v. Stahowiak*, 2005 WI App 219, ¶¶5-7, 287 Wis. 2d 795, 706 N.W.2d 161.

**DISCUSSION**

¶14     This appeal requires us, once we determine[11] if the records are indeed public records and no exemptions apply, to analyze and balance the interplay between various competing rights while, at the same time, protecting both an individual citizen's right to privacy in a matter of utmost importance to the individual's dignity as well as the right of every Wisconsin citizen to the constitutional guarantee of fair elections. *Teigen v. WEC*, 2022 WI 64, ¶22, 403 Wis. 2d 607, 976 N.W.2d 519 ("If the right to vote is to have any meaning at all, elections must be conducted according to law."). An individual's confidentiality regarding a finding as to their competence—or lack thereof—is necessarily juxtaposed against one of the underlying pillars of our democracy:  the right to vote. *See League of Women Voters of Wis. Educ. Network, Inc. v. Walker*, 2014 WI 97, ¶19, 357 Wis. 2d 360, 851 N.W.2d 302; *see also* WIS. STAT. § 6.84(1) ("The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged.").

¶15     Recognizing and carefully walking that tightrope, the legislature created WIS. STAT. ch. 54 to safeguard individuals who are unable to take adequate and appropriate care of themselves while at the same time affording them privacy from public scrutiny and possible scorn or ridicule from the uninformed. The confidential protections afforded to these individuals in need of care, however, are not absolute—especially when they come into conflict with other, just as important, basic rights, including the right not only to vote but to have only

---

[11] There is no doubt that this court follows the well-established analytical path detailed below, *see infra* paras. 24-31, and that WVA did not prevail "before the statutory analysis even beg[an]," Dissent, ¶85.

eligible votes considered in any election. *See Zignego* 396 Wis. 2d 391, ¶64 (Rebecca Grassl Bradley, J., dissenting) ("[R]etaining thousands of potentially illegitimate registrations on Wisconsin's voter lists substantially harms the integrity of elections and dilutes or even cancels votes of validly registered citizens. Removing ineligible voters from this state's registration list is paramount if Wisconsin takes seriously its obligation to ensure fair and honest elections.").

¶16 When faced with that imperative underpinning[12] of our democracy, the right to vote in fair elections, our legislature declared that certain confidentiality and privacy rights for wards under guardianship must be constrained. Thus, once an individual is found to be incompetent *and* ineligible to

---

[12] The court in *State ex rel. McGrael v. Phelps*, 144 Wis. 1, 14-15, 128 N.W. 1041 (1910) (citations omitted), eloquently opined regarding the origins and establishment of the right to vote in the United States Constitution as follows:

> So the right to vote is one reserved by the people to members of a class and as so reserved, guaranteed by the declaration of rights and by sec. 1, art. III, of the Constitution. It has an element other than that of mere privilege. It is guaranteed both by the bill of rights, and the exclusive intrustment of voting power contained in sec. 1, art. III, of the constitution; and by the fundamentally declared purpose of government; and the express and implied inhibitions of class legislation, as well….

> Thus is given the right to vote a dignity not less than any other of many fundamental rights. So it has been rightly said by judicial writers, "It is a right which the law protects and enforces as jealously as it does property in chattels or lands[.] The law maintains and vindicates" it "as vigorously as it does any right of any kind which men may have or enjoy." *State v. Staten*, 46 Tenn. 233, 241…. It has been not inaptly characterized in these lines:

> > A weapon that comes down as still
> > As snowflakes fall upon the sod;
> > But executes a freeman's will,
> > As lightning does the will of God.

vote,[13] that information must be communicated to the state agency responsible for elections (WEC) and subsequently published to the world (via the internet) and to each individual voting precinct so that ineligible votes are neither cast nor counted unless and until that voting eligibility is restored. The names and addresses of the wards are transmitted to a public entity outside the judicial system via a Notice form.

¶17    WVA raised concerns about the course and conduct of various entities in this process. No parties to this appeal dispute that the circuit court oversees guardianship proceedings and that the records, reports, and transcripts[14] leading *up to* a final order in which incompetency *is found* are statutorily confidential. No party disputes that if a ward who is found to be incompetent is also found to be ineligible to vote, the circuit court must communicate that voter ineligibility to WEC, the agency whose express and sole purpose is to ensure fair elections in Wisconsin. *See* WIS. STAT. § 5.05(1). And, no party disputes that individuals who are ineligible to vote are not permitted to vote. Correspondingly, we assume that all parties in this appeal—indeed all Wisconsin citizens—desire,

---

[13] Obviously, not all individuals found to be incompetent lose their right to vote. "The court may, as part of a proceeding under [WIS. STAT. §] 54.44 in which an individual is found incompetent and a guardian is appointed, declare that the individual has incapacity to exercise one or more of the following rights:" The right to consent to marriage, to execute a will, to serve on a jury, to apply for an operator's license, to consent to sterilization, to consent to organ, tissue or bone marrow donation, and to register to vote or to vote in an election. WIS. STAT. § 54.25(2)(c)1.

[14] It is logical to assume that transcripts of hearings, where sensitive, confidential information, reports, and testimony is taken and the actual finding of incompetency is made, would be considered confidential. We, however, note that while such hearings are closed to the public by statute, the ward or his/her attorney are allowed to move that the hearing be open to the public. *See* WIS. STAT. § 54.44(5). Thus, an argument could be made that the confidentiality of an "open" hearing transcript has been waived. We need not—and do not—address that issue. *See* **State v. Castillo**, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (Appellate courts need not address non-dispositive issues and "should decide cases on the narrowest possible grounds.").

seek, and deserve fair elections where valid votes are not canceled or diluted by an ineligible vote. "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (citations omitted); *see also Vieth v. Jubelirer*, 541 U.S. 267, 272 (2004) (recognizing the "one-person, one-vote" requirement under Article I, Section 2, of the United States Constitution).

¶18 Based upon these premises, WVA alleges that the numbers just do not add up: the number of "ineligible voters" listed in WEC's publicly accessible website were inconsistent with the number of wards declared to be ineligible to vote county by county or were so low as to lend great doubt to their accuracy.[15] According to WVA, there is a clear disconnect—and whether the circuit courts are violating the legislature's mandate to notify the local officials or agencies (as directed to do so by the Court System through WEC) of each ineligible voter or

---

[15] For instance, WVA points to records it alleges show that a resident of Outagamie County who, despite being declared incompetent and ineligible to vote in February 2020, voted in the November 2020 and April 2021 elections, and as recently as March 2022, was still listed as active to vote on WisVote. She (or someone on her behalf) requested an absentee ballot in March 2022. WVA also alleges that, as of November 2020, WisVote lists only 802 individuals who are incompetent and ineligible to vote in Wisconsin. That number did not include the Outagamie County individual. Wisconsin had a population of 5,893,718 as of 2020. *Wisconsin: 2020 Census*, UNITED STATES CENSUS BUREAU, https://www.census.gov/library/stories/state-by-state/wisconsin-population-change-between-census-decade.html (last visited Nov. 10, 2023). Seven counties had only one individual listed as incompetent/ineligible to vote, and twelve counties had no such individuals listed. Milwaukee County (population 594,548 as of 2019) had sixty-four people listed as incompetent/ineligible in 2020, while there was only one person so identified in the entire City of Milwaukee. WVA also claims that "[i]n Walworth County, 17 of 157 persons identified as incompetent were found in the WisVote database." While this does not indicate how many of the 157 were also ineligible to vote, the percentages appear inconsistent.

whether WEC is violating the statutes[16] by somehow not accurately or timely acknowledging those notifications and thereby failing to list all ineligible voters on its website is not currently known.

¶19    Every citizen of this state has the right to discern where this error (intentional or not) lies because left unaddressed, it risks each citizen's right to have his or her vote counted in the course of a fair election. "[T]he failure to follow election laws is a fact which forces everyone … to question the legitimacy of election results." ***Teigen***, 403 Wis. 2d 607, ¶25.[17]

---

[16] *See **Teigen v. WEC**,* 2022 WI 64, ¶24, 403 Wis. 2d 607, 976 N.W.2d 519 ("The Wisconsin voters, and all lawful voters, are injured when the institution charged with administering Wisconsin elections does not follow the law, leaving the results in question.").

[17] In ***Teigen***, *id.*, ¶25, our supreme court further explains:

> When the level of pollution is high enough, the fog creates obscurity, and the institution of voting loses its credibility as a method of ensuring the people's continued consent to be governed. *See **State ex rel. Bell v. Conness**,* 106 Wis. 425, 428, 82 N.W. 288 (1900) ("He failed to show that he received a majority of the votes cast at the election, but he succeeded in showing a condition of affairs that taints the whole proceeding and calls for careful consideration. The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to hesitate, when the opportunity is offered, to test them by the strictest legal standards."). A man with an obscured vote may as well be "a man without a vote," and without the opportunity for judicial review, such a man "is without protection; he is virtually helpless." *See* 106 Cong. Rec. 5082, 5117 (1960) (statement of Sen. Lyndon B. Johnson).

## I.    WVA met all the factors for a writ of mandamus.

¶20    In keeping with its stated policy of transparency and openness in the workings of our government, the Wisconsin legislature enacted a Public Records Law. The law, contained in WIS. STAT. § 19.31, states:

> [I]t is ... the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government and the official acts of those officers and employees who represent them. Further, providing persons with such information is declared to be an essential function of a representative government and an integral part of the routine duties of officers and employees whose responsibility it is to provide such information. To that end, [WIS. STAT. §§] 19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

"Our supreme court has recognized this statement of the public interest to be 'one of the strongest declarations of policy to be found in the Wisconsin Statutes.'" *Wisconsin State J. v. Blazel*, 2023 WI App 18, ¶51, 407 Wis. 2d 472, 991 N.W.2d 450 (quoting *Milwaukee J. Sentinel v. DOA*, 2009 WI 79, ¶52, 319 Wis. 2d 439, 768 N.W.2d 700).

¶21    "The [P]ublic [R]ecords [L]aw 'serves one of the basic tenets of our democratic system by providing an opportunity for public oversight of the workings of government.'" *Madison Tchrs., Inc. v. Scott*, 2018 WI 11, ¶17, 379 Wis. 2d 439, 906 N.W.2d 436 (quoting *Nichols v. Bennett*, 199 Wis. 2d 268, 273, 544 N.W.2d 428 (1996)); *see also* *Newspapers, Inc. v. Breier*, 89 Wis. 2d 417, 433-34, 279 N.W.2d 179 (1979) ("The public records statute reflects a basic tenet of the democratic system—that the electorate must be informed of the workings of government.").

> This state recognizes a presumption of accessibility to public records, reflected in both the statutes and in our case law:

> > [Sections] 19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

*Nichols*, 199 Wis. 2d at 273 (alteration in original) (quoting WIS. STAT. § 19.31). "Mandamus is the proper means to challenge a governmental [entity's] failure to comply with the requirements of Wisconsin's [Public] [R]ecords [L]aw."[18] *Greer*, 287 Wis. 2d 795, ¶7. Notwithstanding this presumption of openness, there is no absolute right of access to public records. "Access to records may be denied where there is a specific statutory exemption to disclosure, WIS. STAT. § 19.36, or where there is a common law or public policy exception." *Watton v. Hegerty*, 2008 WI 74, ¶10, 311 Wis. 2d 52, 751 N.W.2d 369.

¶22 "Mandamus is an extraordinary legal remedy, available only to parties that can show that the writ is based on a 'clear, specific legal right which is free from substantial doubt.'" *Lake Bluff Hous. Partners*, 197 Wis. 2d at 170 (quoting *State ex rel. Collins v. American Fam. Mut. Ins. Co.,* 153 Wis. 2d 477, 483, 451 N.W.2d 429 (1990)). It "may be employed to compel public officers to perform a duty that they are legally obligated to perform." *Watton*, 311 Wis. 2d 52, ¶7.

---

[18] The terms "open records law" and "public records law" are commonly used interchangeably. However, the appropriate term is "Public Records Law." *See* WIS. STAT. §§ 19.31 to 19.39.

¶23 According to ***Watton***:

> In order to obtain a writ of mandamus compelling disclosure of records, the petitioner must establish that four prerequisites are satisfied: (1) the petitioner has a clear legal right to the records sought; (2) the government entity has a plain legal duty to disclose the records; (3) substantial damages would result if the petition for mandamus was denied; and (4) the petitioner has no other adequate remedy at law.

*Id.*, ¶8; ***Pasko v. City of Milwaukee***, 2002 WI 33, ¶24, 252 Wis. 2d 1, 643 N.W.2d 72.

¶24 Our supreme court has instructed courts to undertake a two-step procedure to determine whether a document/record should be disclosed. ***Linzmeyer v. Forcey***, 2002 WI 84, ¶¶10-11, 254 Wis. 2d 306, 646 N.W.2d 811. First, we must "determine whether the open records law applies to the record in question." *Id.*, ¶10. To do that, we must "look at the statutory language of that law, along with its statutory and common law exceptions." *Id.*

¶25 "Documents on file with a court or custodian may be considered public records." ***State ex rel. Mitsubishi Heavy Indus. Am., Inc. v. Circuit Ct. for Milwaukee Cnty.***, 2000 WI 16, ¶19, 233 Wis. 2d 1, 605 N.W.2d 868. Even though the ***Reynolds*** court recently determined that the Notices of Voter Eligibility are "pertinent to the finding of incompetency," they may still be subject to the Public Records Law. *See **Reynolds***, ___ Wis. 2d ___, ¶28. Significantly, no parties dispute that the Notices themselves constitute a "record," as that term is defined in Wisconsin's Public Records Law. *See* WIS. STAT. § 19.32(2). And we have not been presented with anything to conclude otherwise.

¶26 Thus, the Public Records Law applies to the Notices of Voting Eligibility (or any equivalent communication) sent to WEC, satisfying the first

step of the public records analysis. The "second issue is whether the presumption of openness under the … law is overcome by any other public policy." *Linzmeyer*, 254 Wis. 2d 306, ¶11. "The fundamental question we must ask is whether there is harm to a public interest that outweighs the public interest in inspection of the [record.]" *Id.*, ¶24. "Wisconsin law does recognize three types of exceptions to this general policy of open access: (1) statutory exceptions; (2) common law exceptions; and (3) public policy exceptions." *Democratic Party of Wis. v. DOJ*, 2016 WI 100, ¶10, 372 Wis. 2d 460, 888 N.W.2d 584.

¶27 "Public policy and public interest favor the public's right to inspect public records." *Hathaway v. Joint Sch. Dist. No. 1*, 116 Wis. 2d 388, 392, 342 N.W.2d 682 (1984). As the legislature states in WIS. STAT. § 19.31:

> [I]t is declared to be the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government .... To that end, [WIS. STAT. §§] 19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

*See Linzmeyer*, 254 Wis. 2d 306, ¶14 ("The legislature has clearly articulated the policy regarding the release of government records" in the statute.).

¶28 Here, there is the general public policy of protecting the dignity and privacy of individuals who are determined to be incompetent. That policy, however, is expressly outweighed by the legislature's mandate that voting ineligibility determinations are to be publicly communicated to the local officials or agencies through WEC (as directed by the Court System) and the public in general. No statutory exception is listed under the Public Records Law for these notices.

¶29     There is an interesting twist to this public record law inquiry:  The Notices of Voting Eligibility forms are already released, by express statutory mandate, to the local officials or agencies through WEC (as directed by the Court System)—with no restrictions or additional requirements of continued confidentiality.  Not only that, but WEC then publishes the statutorily mandated information obtained from those Notices to the world by including that data on WisVote.  Given the *public* status of the Notices, it is unreasonable for Secord to assert that the Notices are "closed" public records that may never be released to the public.  Their very nature and purpose *is* to release the form and all information contained therein *precisely* because the legislature (as is its prerogative) has made a public policy balancing and determination that the constitutional rights of voters in the state outweigh the privacy concerns of individuals declared not eligible to vote.  Moreover, while no case sets forth the obvious standard that a publicly available or already released document can no longer cloak itself in the confidentiality provisions of the Public Records Law, this court, in ***Stone v. Board of Regents of the Univ. of Wis. Sys.***, 2007 WI App 223, ¶20, 305 Wis. 2d 679, 741 N.W.2d 774, a case where a requester sought identical copies of documents, agreed "that it would be absurd to construe the term 'record' in WIS. STAT. § 19.32(2) as including an identical copy of an *otherwise available* record." (emphasis added).  That concept would equally apply where a record was already made available to the public.

¶30    Secord focuses her entire argument, with respect to whether the Notices of Voting Eligibility may be released, on the second sentence[19] in WIS. STAT. § 54.75: "The fact that an individual has been found incompetent and the name of and contact information for the guardian is accessible to any person who demonstrates to the custodian of the records a need for that information." But, she fails to read, reference, or give appropriate attention to the first sentence: "All court records pertinent to the finding of incompetency are closed *but subject to access* as provided in [WIS. STAT. §§] 51.30 or 55.22 *or under an order of a court under this chapter*." Sec. 54.75 (emphasis added).

¶31    Next, each prerequisite for the petition for writ of mandamus must be addressed. First, there is a clear legal right. Access to public records is a vital and integral factor of Wisconsin's avowed presumption towards open government. The legislature has expressly mandated its preferences for such open access with a statutory directive for the circuit court's positive and plain duty to communicate voter eligibility determinations (regardless of whether a guardian is appointed) to local officials or agencies (accomplished based on direction of the Court System through WEC). The first two prerequisites have been satisfied.

¶32    WVA has detailed discrepancies between issued voter ineligibility determinations (as communicated by Notice to WEC) and what WEC promulgates on its WisVote database. Substantial damages lie not only with WVA and Heuer with respect to their efforts to improve WisVote's database to ensure that circuit

---

[19] The ***Reynolds*** court concluded that the second sentence was "inapplicable here, however, because [WVA]'s position is that it is entitled only to the [Notice of Voting Eligibility] forms, not to the information referenced in this sentence." ___ Wis. 2d ___, ¶33. Thus, the court concluded it "need not discuss whether [WVA] has demonstrated a 'need' for information that is not the subject of [WVA]'s request or mandamus action." ***Id.***

court orders restricting incompetent individuals from voting are honored, but damages also exist for all qualified voters in Wisconsin whose constitutional right to vote in fair elections where only valid votes are counted is at risk. Voter integrity and public confidence in our system of elections is placed in jeopardy. The damage to legitimate voters and the possible dilution of their votes legally cast is yet another damage. Moreover, there is also the potential harm to vulnerable individuals subject to competency proceedings who may be coerced to vote illegally or may have their votes stolen. Taken altogether, WVA has clearly and convincingly established that substantial damage would result if its petition were denied.

¶33 Finally, respondents have failed to adequately counter WVA's contention that there is no other adequate remedy at law. Neither the circuit court nor the Register in Probate is required to audit whether the local officials or agencies and WEC comply with the legislative mandate to identify the voters who are court-ordered as ineligible to vote. Neither was WVA obligated first to pursue a declaratory judgment action. That satisfies the final prerequisite.

¶34 Having met all prerequisites for its petition for a writ of mandamus, the circuit court erroneously dismissed WVA's petition.

**II. In the alternative, WVA has demonstrated a public need[20] for the Notices, which bolsters the release of the other information by "order of the court."[21]**

¶35 As an alternative, WVA argues public need. It has indeed demonstrated public need, which bolsters support for the release of these Notice forms under the Public Records Law as allowed by an "order of the court," the circuit court incorrectly stated that WVA does not claim access to the voter ineligibility information under WIS. STAT. §§ 51.30 or 55.22 implying that WVA has not demonstrated a "need" for that information pursuant to WIS. STAT. § 54.75. Secord asserts that WVA does not need this information, claiming that WVA "at best, demonstrated a desire to obtain the statutorily protected and confidential information to achieve its own political goals," is "engag[ed] in a wild-goose chase seeking to dispute the legitimacy of elections," and that "a political witch hunt is not a sufficient 'need.'"[22]

---

[20] The dissent emphasizes that the legislature has several election reform bills pending that *could* make this opinion or its analysis inapt. Dissent, n.11. That is patently irrelevant. The legislature could always have bills pending that could alter the analysis of any opinion, but that is not a basis for this court to wait and see what comes of the sausage-making process that is legislative operations. *See In re Ashley*, 317 B.R. 352, 360 n.10 (Bankr. C.D. Ill. 2004) (mentioning "the aphorism that 'no one should watch how laws or sausages are made.'"). Simply put, pending legislation is precisely that: pending. It is not binding and it has no effect on the courts nor the citizens of the State. Even if a new law finally wended its way through the legislature, in must be endorsed by the executive branch (the Governor) to become law. If the court were to take the policy of waiting for legislative and executive action, it would be abdicating its duties as a co-equal branch of the government. "The judicial power to interpret the law, [the United States Supreme] Court has held, 'can no more be shared with another branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'" *Kisor v. Wilkie*, 588 U.S. ___, 139 S. Ct. 2400, 2438 (2019) (J. Gorsuch, concurring) (quoting *Stern v. Marshall*, 564 U.S. 462, 483 (2011)).

[21] We need not address WVA's additional arguments, which are related to, among other things, declaratory judgment. *See Castillo*, 213 Wis. 2d at 492.

[22] Frankly, we abhor the personal disparagements and hyperbolic rhetoric currently used in briefs. It is "at best" counterproductive, not to mention uncivil.

¶36 This court is not required to determine what underlying motives rest beneath a legitimate "need" for information. Here, WVA asserts it has an interest in seeing that the voter rolls in Wisconsin are accurate so that our elections comport with constitutional guarantees. If maintaining accurate voter lists—as statutorily required by the legislature—is not a sufficient need, we are hard-pressed to articulate another. In the current environment of unfortunate accusations flying from both sides, the judiciary must stand firm and—setting aside personalities, slings, and arrows—merely perform its obligations as one of the three co-equal branches of government. Deciding cases in conformity with the Constitution is "of the very essence of judicial duty." *Marbury v. Madison*, 5 U.S. 137, 178 (1803) (a case in which, coincidentally, a writ of mandamus was at issue); *see also Gabler v. Crime Victims Rts. Bd.*, 2017 WI 67, ¶2, 376 Wis. 2d 147, 897 N.W.2d 384 (explaining the separation of powers doctrine and noting "[e]ncroachment on judicial power degrades the judicial independence that serves as a bulwark protecting the people against tyranny").

¶37 WVA establishes two other bases for seeking this information. First, there is an alternative non guardianship procedure to obtain a designation of voter ineligibility. Pursuant to WIS. STAT. § 54.25(2)(c)1.g., "any elector of a municipality may petition the circuit court for a determination that an individual residing in the municipality is incapable of understanding the objective of the elective process and thereby ineligible to register to vote or to vote in an election." That determination, if made by a court, is likewise to be communicated to local officials or agencies, *id.* (through WEC as directed by the Court System). That establishes that Notices of Voting Eligibility may arise in non-guardianship situations and without a guardianship case.

¶38 Next, any elector may initiate a challenge to a voter's registration. *See* WIS. STAT. § 6.48(1). This results in a public hearing. Accordingly, electors—including Heuer—have a basis to seek information relating to individuals who are found to be incompetent in order to exercise their statutory right to challenge voter registrations.

¶39 By law and direction of the Court System, WEC is to assist in changing a voter's status if a court declares that individual to be ineligible to vote (in this case, due to a finding of incompetency) after it receives the communication (the Notice) from a court pursuant to WIS. STAT. § 54.25(2)(c)1.g. The court in *Zignego* outlined the procedure to be utilized with respect to revisions to Wisconsin's state voter registration lists:

> Subsections (1), (2), and (2g) outline a procedure whereby those who have not voted in the previous four years are changed to an ineligible status on the statewide registration list. WIS. STAT. § 6.50(1), (2), (2g). After a general election, the "commission" is required to examine the registration records and identify non-voting electors. § 6.50(1). The Commission then must mail a notice that tells the elector that their registration will be suspended unless the elector applies for continuation within 30 days. *Id.* If continuation of registration is not applied for within 30 days, "the commission shall change the registration status of that elector from eligible to ineligible." § 6.50(2). However, the "commission" may delegate changing of registration statuses "to a municipal clerk or board of election commissioners of a municipality." § 6.50(2g). Ultimately, the statutory responsibility to change the registration status for non-voting electors is squarely placed on the Commission.

*Zignego*, 396 Wis. 2d 391, ¶23.

¶40 We conclude that WVA has met all prerequisites for a petition for writ of mandamus such that the circuit court's order must be reversed pursuant to a balancing of interests as required by the Public Records Law as allowed by the

first sentence in WIS. STAT. § 54.75. We also conclude that WVA has demonstrated a need for information that further supports the release of the Notices of Eligibility under § 54.75 such that it is entitled to that information and to a reversal of the circuit court's decision.

## CONCLUSION

¶41 The circuit court erroneously dismissed WVA's petition for a writ of mandamus. We hold that because WVA has demonstrated that disclosure of these records (which have already been made publicly available pursuant to statute) is appropriate under the Public Records Law, WVA is entitled to the requested forms (in an appropriately redacted[23] form). Accordingly, we reverse the circuit court's order and remand this matter for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded for further proceedings.

Recommended for publication in the official reports.

---

[23] Neither WVA nor any member of the public should be given the guardianship case number or the birthdate of an individual in need. The released information should comport with what the WEC previously publicly posted on its webpage. We leave to the circuit court what other information, if any, should be redacted to protect the privacy of an individual.

No.    2023AP36(C)

¶42    LAZAR, J. (*concurring*).    Because we disagree with the analysis in *Wisconsin Voter Alliance v. Reynolds*, 2023 WI App 66, ¶¶20-34, ___ Wis. 2d ___, ___ N.W.2d ___, with respect to the definition of the phrase "pertinent to the finding of incompetency," we submit this concurrence.    We conclude that the voter ineligibility determination is not pertinent to the finding of incompetency; it is a consequence of such a finding.    Moreover, it is a determination that the legislature has independently designated as nonconfidential and subject to public disclosure via communication to local officials or agencies (as directed to do so by the Wisconsin Court System (Court System) through the Wisconsin Election Commission (WEC)), to WEC's public website, and to the appropriate voting precincts in the state to allow electors to challenge voter eligibility.    In other words, this information is publicly available.

### III.    The Notice of Voting Eligibility is not "pertinent to the finding of incompetency."

¶43    The circuit court glosses over the key issue in this appeal:    Is the Notice of Voting Eligibility (or any equivalent communication to the local officials or agencies through WEC, as directed by the Court System) "pertinent to the finding of incompetency" of the ward identified in that communication? Instead, it holds—with no explanation or articulation of what "pertinent to the finding of incompetency" means—that the Notice Form is "generated as a part of the Order at a Guardianship hearing and is a court record pertinent to the finding of incompetency."    It further states that the Form "is a written memorialization of the court decision as to voter competency."    These holdings require examination.

## A. The statutory interpretation of "pertinent" in context

¶44 "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *State ex rel Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). The court will read statutory language to give reasonable effect to every word to avoid surplusage. *Id.* Here, it is not just a question of what "pertinent" means, but rather how the entire phrase should be defined.

¶45 Before *Reynolds*, no Wisconsin cases explicitly defined what "pertinent" means. A travel down the centuries, however, sheds significant light not only on a definition of "pertinent" but how the phrase "pertinent to the finding of incompetency" should be applied in context. A 1906 defamation case regarding comments made to a grand jury, *Schultz v. Strauss*, 127 Wis. 325, 329, 106 N.W. 1066 (1906), involved the question of whether words were "spoken in the course of judicial proceedings and were they pertinent and related to the subject of inquiry?" Our supreme court held that "the alleged defamatory matter was applicable and pertinent to the subject under consideration by the grand jury, and that it was communicated to them in the course of a judicial proceeding." *Id.* The *Schultz* case is instructive. The comments were pertinent to the grand jury's deliberation as to whether to issue a charge just as the WIS. STAT. ch. 54 petition, reports, and evidence are pertinent to the finding of incompetency, and for that reason, they, like the grand jury statements, are privileged or confidential. The determination of the grand jury—just as the voting eligibility determination in this appeal—is, however, not pertinent to the grand jury proceeding and is not confidential. Both the grand jury charge and the voter eligibility communications

are expressly designed to be made public. Neither are "pertinent to the finding" of the respective deliberative body.

¶46 Next, in ***Bussewitz v. Wisconsin Teachers' Ass'n***, 188 Wis. 121, 128, 205 N.W. 808 (1925), again tethering "pertinent" to what takes place in court on the record, the court looked back even further to a decision from 1841 to find that comments made in court were not subject to defamation charges, and quoted from that decision:

> "The question, therefore, in such cases is not whether the words spoken are true, not whether they are actionable in themselves, but whether they were spoken in the course of judicial proceedings, and whether they were relevant and pertinent to the cause or subject of inquiry. And in determining what is pertinent, much latitude must be allowed to the judgment and discretion of those who are intrusted with the conduct of a cause in court."

(quoting ***Hoar v. Wood***, 44 Mass. 193 (1841)).

¶47 The ***Bussewitz*** court's favorable citation to the quote from ***Hoar*** evidences a decision to limit "pertinent" to those comments, spoken in the judicial proceeding, that relate to the "cause or subject of inquiry." There was no effort to expand "pertinent" to what occurs *after* a judicial proceeding has concluded with a final order by the court.

¶48 A relatively recent Wisconsin case further addresses pertinent statements while discussing privileges and/or immunity for statements or actions made in the course of a judicial proceeding. In ***Snow v. Koeppl***, 159 Wis. 2d 77, 81, 464 N.W.2d 215 (Ct. App. 1990), when the court held that a court-ordered psychological evaluation for a family matter was privileged and its author was insulated from liability for breach of confidentiality and invasions of privacy, it declared that "[t]he determination whether the statements are pertinent and

3

relevant to the issues is a question of law for the court [to review] and not a fact issue for the jury." Here again, the ***Snow*** court (albeit combining pertinent and relevant) links the word "to the issues," not to the consequences of a court order. ***Id.***

¶49 This is further substantiated by the fact that the legislature has declared that an "'[i]ndividual found incompetent' means an individual who has *been adjudicated* by a court as meeting the requirements of [WIS. STAT. §] 54.10(3)." WIS. STAT. § 54.01(16).[1] The inclusion of an adjudication or a finding adds context to the word "pertinent." It emphasizes that, per ***Kalal***, the word cannot be considered in isolation. *See **Kalal***, 271 Wis. 2d 633, ¶46. Additional cases add further illumination to the inquiry.

¶50 There are cases where "pertinent" is considered synonymous with "relevant" in the context of whether a character trait may be admitted into evidence under WIS. STAT. § 904.04(1)(a). In ***Milenkovic v. State***, 86 Wis. 2d 272, 281, 272 N.W.2d 320 (Ct. App. 1978), the court differentiated between pertinent and relevant, but did not define pertinent other than to note that prior

---

[1] WISCONSIN STAT. § 54.10(3)(a) provides, in relevant part:

> A court may appoint a guardian of the person or a guardian of the estate, or both, for an individual based on a finding that the individual is incompetent only if the court finds by clear and convincing evidence that all of the following are true:
>
> ….
>
> 2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety.

sexual activity of a rape victim "is not a pertinent trait of character, nor is it relevant to consent in a rape case." And, later, in **State v. Davis**, 2002 WI 75, ¶16, 254 Wis. 2d 1, 645 N.W.2d 913, our supreme court explained that "'[p]ertinent' refers to the relevance of the traits." (Citing 7 Daniel Blinka, Wisconsin Practice: Wisconsin Evidence § 404.4, at 133 (2d ed. 2001)).

¶51 Neither of these cases provide much insight, nor do they show a tendency to expand the definition of pertinent beyond a reference to a determination regarding character traits. Taken altogether, these cases support a conclusion that "pertinent to a finding," "pertinent to a judicial proceeding" or "pertinent to a specific character trait" is limited by the remainder of the phrase in which pertinent is embedded.

¶52 A perusal of dictionary definitions is, likewise, not dispositive, but is somewhat instructive. Merriam-Webster defines "pertinent" as "having a clear decisive relevance *to the matter in hand*." *Pertinent*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/pertinent (last visited Oct. 31, 2023) (emphasis added). Black's Law Dictionary defines it as "pertaining *to the issue at hand*; relevant." *Pertinent*, BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added). Again, this supports a conclusion that pertinent *to the finding* of incompetency contemplates information, data, and testimony that is referenced in the judicial proceedings and leads up to the court-ordered adjudication.

¶53 The actual order form finding incompetency (State Form No. GN-3170) is also on point. It specifically states, at the start, that a petition was filed, a hearing was held, and that the circuit court, "[a]fter consideration of the reports and other documents on file, all factors required by the statutes, and such

additional information presented" finds and grants or denies the petition. The order concludes with the mandatory language that it "**IS A FINAL ORDER FOR PURPOSE OF APPEAL IF SIGNED BY A CIRCUIT COURT JUDGE.**" *See* WIS. STAT. § 808.03(1); *Wambolt v. West Bend Mut. Ins. Co.*, 2007 WI 35, ¶4, 299 Wis. 2d 723, 728 N.W.2d 670.

¶54 When appointing a guardian, the circuit court may order specific rights that are to be removed in full from the subject individual. The court can check a box to order that "[t]he individual has the incapacity to exercise the right to ... (3) register to vote or to vote in an election because the individual is unable to understand the objective of the elective process." This is in a list of rights that "**[i]f removed, ... may not be exercised by any person.**"[2] Therefore, no one— not even the guardian of the individual ward—may exercise the right to vote if that right has been "removed" due to a finding of incompetency.

¶55 After a final order "finding of incompetency" is made, the court then completes a Notice of Voting Eligibility and communicates that publicly to the local officials or agencies (as directed to do so by the Court System to WEC). That Notice has references to [WIS. STAT. §] ch. 54, thereby publicly putting WEC, the viewers of WisVote, and all voting precincts on notice that an individual has been declared incompetent. Even though the Notice is also contained in the electronic court file, that is not dispositive because public documents can also be filed in confidential court files without losing their public

---

[2] Seven other rights may "be removed in full or exercised by individual only with consent of guardian of person."

designation. The Notice is only completed and disseminated *after* a finding of incompetency.

¶56     Albeit in reference to the predecessor statute, the Wisconsin Attorney General has opined (interpreting WIS. STAT. § 880.33(6)) that "only the file containing the documents themselves are 'records pertinent to the finding of incompetency.' Only the documents themselves provide information which the court uses to find an individual is 'substantially incapable of managing his property or caring for himself.'" 67 Wis. Op. Atty. Gen. 130, 131 (1978).[3] Once again, an authority[4] defines documents and information that lead up to and are utilized in deliberations as things that are pertinent to a specific finding.

¶57     Thus, all of the legal authorities, all of the cases, and all of the dictionary definitions lead to the conclusion that there is a clear distinction between what is pertinent and what is pertinent to a specific finding. While "pertinent" could be considered similar to relevant, and could—arguably—mean that *anything* related to a judicial proceeding, whether it be before or after a court finding or determination, is "pertinent." That expansive use of the word is circumscribed with the addition of the rest of the limiting phrase: "to the finding

---

[3] The Attorney General Opinion continued, and noted that "[t]he index and docket are not pertinent to the court's consideration." 67 Wis. Op. Atty. Gen. 130, 131. Attorney General Opinions are "only persuasive authority. An opinion has considerable weight if the legislature later amends and revises a statute but makes no changes in response to the opinion." *State ex rel. North v. Goetz*, 116 Wis. 2d 239, 244-45, 342 N.W.2d 747 (Ct. App. 1983). The statute referenced in the Attorney General Opinion (WIS. STAT. § 880.33(6)) was amended in 2005 (to WIS. STAT. § 54.75) but was not revised to alter the opinion set forth in 1978. *See* 2005 WIS. ACT 387, § 471 (renumbering § 880.33(6) to WIS. STAT. § 54.75).

[4] The *Reynolds* court also references this Attorney General Opinion but asserts that because the Notice is a part of the court file, WVA's arguments are undercut. ___Wis. 2d ___, ¶30 n.8. We disagree as already detailed herein.

7

of incompetency." The inclusion of those words must mean something; they cannot be surplusage.

### B. The Notice of Voting Eligibility is a consequence, not a finding.

¶58 The circuit court, understandably and reasonably concerned over the privacy and dignity of individuals involved in guardianship proceedings and the possible release of sensitive information, failed to consider and differentiate the steps of the process "of finding incompetency" and it failed to align those steps with the clear legislative mandate with respect to elections and elector qualifications. Each step of the process must be carefully broken down and analyzed.

¶59 First, we look at what the legislature identifies as being confidential and what it requires to be made publicly available. As explained above, it is the procedure resulting in a "finding of incompetency" that is initially cloaked from public access. The legislature itemizes what documents, proof and procedural steps are inherently pertinent to that finding of incompetency: (1) the petition that initiates the guardianship proceeding, WIS. STAT. § 54.34(1); (2) the report of a guardian ad litem, if one was appointed, WIS. STAT. § 54.10(2); (3) the written statement by a licensed physician or licensed psychologist, or both, with the experts' "professional opinion regarding the presence and likely duration of any medical or other condition causing the proposed ward to have incapacity," WIS. STAT. § 54.36(1); (4) the jury or court hearing (as memorialized in a transcript or court minutes) at which the ward may challenge a finding of incompetency, WIS. STAT. § 54.44; and (5) the final order detailing the finding of incompetency and the legal consequences of such a determination, WIS. STAT. § 54.46.

¶60     The finding by the circuit court that is memorialized in that final order (Form GN-3170) is filed in the guardianship record. The order is detailed and contains numerous statements about the incompetency of the ward as well as various rights that the ward may—or may no longer—be eligible to exercise. *See* WIS. STAT. § 54.25(2)(c). That document is confidential—and rightly so due to its length and thorough detailed description[5] of the ward's condition. The execution of that order is the pure essence of the circuit court's finding of incompetency.

¶61     At that point in time, the ward has been found to be incompetent. All of the records and forms leading up to that finding are "pertinent" to the finding of incompetency. The next steps taken by the circuit court are consequences of such a finding. The first of these steps is the legislature's mandate that *only in those cases where the right to vote has been removed*, the circuit court must publicly acknowledge and communicate that voter ineligibility to the local officials or agencies (as directed to do so by the Court System through WEC) to preserve the sanctity of Wisconsinites' right to vote. WIS. STAT. § 54.25(2)(c)1.g.

¶62     In fact, these Notices can be utilized in non guardianship instances where an individual is determined to be ineligible to vote.[6] The fact that the form

---

[5] The order allows a court to communicate the basis on which the individual was found to be incompetent: "a developmental disability," "degenerative brain disorder," "serious and persistent mental illness" or "other like incapacities." Certainly, that sensitive information is not only pertinent to the finding of incompetency, but it is information the legislature has rightly declared to be confidential.

[6] Pursuant to WIS. STAT. § 54.25(2)(c)1.g., "any elector of a municipality may petition the circuit court for a determination that an individual residing in the municipality is incapable of understanding the objective of the elective process and thereby ineligible to register to vote or to vote in an election." That determination, if made by a court, is likewise to be communicated to the local officials or agencies (as directed to do so by the Court System through WEC). ***Id.***

9

can be used by a circuit court even when there is no guardianship case further bolsters the conclusion that the post-judicial-determination-of-voter-eligibility form is not pertinent to the finding of incompetency where it would be included in a confidential case file.

### IV. The *Reynolds* interpretation of "pertinent to the finding of incompetency" is incorrect.

¶63    The *Reynolds* court concluded that the Notice of Voter Eligibility forms are "pertinent to the finding of incompetency" and are "therefore barred from disclosure under WIS. STAT. § 54.75." ___ Wis. 2d ___, ¶34. First, the *Reynolds* court disagrees with WVA's argument (in that appeal) that the Notices are created after the proceedings and thus "could not have played a role in the court's finding" of incompetency. *Id.*, ¶25. The *Reynolds* court explained that WVA appeared to be trying to write words into the statute. *Id.*, ¶26.

¶64    It is well recognized that courts may not add language to a statute. This canon of construction was nicely summarized by our supreme court in *State v. Neill*, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521, as follows:

> "One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning." *Fond Du Lac C[n]ty. v. Town of Rosendale*, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989) (citation omitted); *see also Dawson v. Town of Jackson*, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316 ("We decline to read into the statute words the legislature did not see fit to write." (citation omitted)); *State v. Wiedmeyer*, 2016 WI App 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805 ("It is not up to the courts to rewrite the plain words of statutes[.]"). "[R]ather, we interpret the words the legislature actually enacted into law." *State v. Fitzgerald*, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165.

(Alterations in original).

¶65    While we agree that "[m]any court records that are pertinent to a [circuit] court's decision—such as court forms, written opinions, and transcripts of proceedings in which decisions are made—are created after the court has made a decision," **Reynolds**, ___ Wis. 2d ___, ¶26, that—in and of itself—does not mean that every record created after such decisions necessarily *are* pertinent to a court's findings. As explained above, there is a clear distinction between a finding and a consequence.

¶66    Next, the **Reynolds** opinion, like the circuit court in this appeal, considered the term "pertinent" and its dictionary definitions, but it did not delve into the word in the context of the entire phrase in which it is used. **Reynolds** looked to two dictionary definitions[7] of "pertinent" and, again like the circuit court in this appeal, linked "pertinent" to "relevant," concluding:

> Under any of these definitions, the requested [Notice of Voter Eligibility] forms are clearly "pertinent to the finding of incompetency." The requested forms "hav[e] some

---

[7]  The **Reynolds** court elucidated as follows:

> [WVA] also offers two dictionary definitions of "pertinent": first, "[h]aving some connection with the matter at hand; relevant; to the point," https://www.collinsdictionary.com/us/dictionary/english/pertinent (last visited Nov. 6, 2023); and second, "[p]ertaining to the issue at hand; relevant," BLACK'S LAW DICTIONARY 1181 (8th ed. 2004). *See* **Spiegelberg v. State**, 2006 WI 75, ¶19, 291 Wis. 2d 601, 717 N.W.2d 641 (in determining ordinary meaning of words that are undefined by statute, "[w]e may consult a dictionary to aid in statutory construction"). Although we do not perceive any consequential difference in these definitions, we note that a more recent edition of [WVA]'s second source defines "pertinent" as "[o]f, relating to, or involving the particular issue at hand; relevant." *Pertinent*, BLACK'S LAW DICTIONARY (11th ed. 2019).

**Reynolds**, ___ Wis. 2d ___, ¶27 (alterations in original).

11

> connection with" and "relat[e] to," the finding of incompetency because they are created in the context of proceedings in which incompetency is determined for purposes of establishing guardianship. *See* WIS. STAT. § 54.25(2)(c)1.g. ("The court may, as part of a proceeding under [WIS. STAT. §] 54.44 in which an individual is found incompetent and a guardian is appointed, declare that the individual has incapacity to exercise ... [t]he right register to vote or to vote in an election.").

*Reynolds*, ___ Wis. 2d ___, ¶28 (alterations in original).

¶67 This conclusion, based solely on the definition of pertinent, fails to consider how "pertinent" applies to the remainder of the phrase: "to the finding of incompetency." As detailed above, this court has conducted that analysis and based upon the holdings in *Hoar*, *Schultz*, *Bussewitz*, and *Snow*, the word "pertinent" is circumscribed, and its potential expansive nature that is commonly linked to "relevant" is limited, when taken together with the remainder of the phrase in which it is used. The embedding of pertinent in the key phrase must—and does—mean something more than just "pertinent." *See Kalal*, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results."). That something more is the legislature's intent that a record that contains the voting ineligibility consequence of a limited number of circuit findings of incompetency is created after such a finding. Not only that, but it is a consequence that statutorily *must be* publicly communicated to the local officials or agencies (as directed to do so by the Court System through WEC).

¶68 The circuit court was well-meaning in its effort to protect incompetent individuals, clearly "some of the most vulnerable citizens of Walworth County," and to avoid "opening the door for intrusion into other confidential information to satisfy [WVA's] objectives." We agree that the

confidential, sensitive information of incompetent individuals must be protected (absent a court-found need for disclosure or determination that the Public Records Law otherwise requires disclosure), but conclude nevertheless that the Notice of Voting Eligibility is *not* pertinent to the finding of incompetency. Accordingly, it is subject to disclosure—in an appropriately redacted format.

¶69 I am authorized to state that Judge Shelley A. Grogan joins this concurrence.

**No. 2023AP36(D)**

¶70 NEUBAUER, J. (*dissenting*). Today the majority upends Wisconsin's Public Records Law, WIS. STAT. §§ 19.31-.39 (2021-22),[1] and takes the unprecedented step of compelling the Walworth County Register in Probate to disclose to the public records contained in guardianship case files that this court recently concluded are confidential and exempt from disclosure. The majority's opinion disregards this court's obligation to adhere to prior precedent, ignores an applicable exception to disclosure in the Public Records Law, and tosses aside the analytical framework governing access to records claims. For these reasons, I respectfully dissent.

## I. *Reynolds* Controls this Case.

¶71 Chief among the majority opinion's flaws is its very existence. This court recently addressed the same issues raised in this appeal in *Wisconsin Voter Alliance v. Reynolds*, 2023 WI App 66, ___ Wis. 2d ___, ___ N.W.2d ___.[2] In *Reynolds*, we concluded that the *very same records* sought by the Wisconsin Voter Alliance and its president, Ron Heuer (collectively, WVA), in this appeal— Notice of Voter Eligibility (NVE) forms contained in guardianship case files—are categorically exempt from disclosure under WIS. STAT. § 54.75 and a provision in

_____

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] The Wisconsin Voter Alliance and Ron Heuer did not file a petition seeking review of our decision in *Wisconsin Voter Alliance v. Reynolds*, 2023 WI App 66, ___ Wis. 2d ___, ___N.W.2d ___, with the Wisconsin Supreme Court.

the Public Records Law, WIS. STAT. § 19.36(1). *Reynolds*, ___ Wis. 2d ___, ¶20. The majority concedes it is bound by *Reynolds* unless that case can be distinguished. Majority, ¶3. Although *Reynolds* is not distinguishable, the majority refuses to follow it, preferring instead its own unsound legal analysis. The majority's decision violates this court's obligation under *Cook v. Cook*, 208 Wis. 2d 166, 560 N.W.2d 246 (1997) to adhere to prior precedent. *See id.* at 189-90 ("[O]nly the supreme court, the highest court in [Wisconsin], has the power to overrule, modify or withdraw language from a published opinion of the court of appeals.").

**A. *Reynolds* is procedurally indistinguishable from this case.**

¶72    In every material respect, *Reynolds* is on all fours with the present case. Both began as mandamus actions filed by WVA against county registers in probate seeking the disclosure of NVE forms and other information contained in guardianship case files under Wisconsin's Public Records Law. *See* WIS. STAT. §§ 19.31-.39.[3] In both cases, the circuit courts dismissed WVA's petitions after concluding that a provision in the guardianship statutes, WIS. STAT. § 54.75,

---

[3] *Reynolds* and this case are two of thirteen civil actions commenced by the Wisconsin Voter Alliance seeking writs of mandamus against county officials to obtain NVE forms. The other eleven are *Wisconsin Voter Alliance v. Young*, Brown County Circuit Court Case No. 22-CV-882; *Wisconsin Voter Alliance v. Redman*, Crawford County Circuit Court Case No. 22-CV-46; *Wisconsin Voter Alliance v. Sheffler*, Kenosha County Circuit Court Case No. 22-CV-771; *Wisconsin Voter Alliance v. Siegenthaler*, Lafayette County Circuit Court Case No. 22-CV-59; *Wisconsin Voter Alliance v. Mayr*, Langlade County Circuit Court Case No. 22-CV-86; *Wisconsin Voter Alliance v. Goodwin*, Marquette County Circuit Court Case No. 22-CV-47; *Wisconsin Voter Alliance v. Mueller*, Ozaukee County Circuit Court Case No. 22-CV-256; *Wisconsin Voter Alliance v. Anderson*, Polk County Circuit Court Case No. 22-CV-199; *Wisconsin Voter Alliance v. Campbell*, Taylor County Circuit Court Case No. 22-CV-53; *Wisconsin Voter Alliance v. Halverson*, Vilas County Circuit Court Case No. 22-CV-66; and *Wisconsin Voter Alliance v. Peterson*, Vernon County Circuit Court Case No. 22-CV-082. According to the Circuit Court Access Program (CCAP) website, all thirteen actions were commenced on July 26, 2022.

2

exempted the documents and information WVA sought from disclosure under the Public Records Law. *See* ***Reynolds***, ___ Wis. 2d ___, ¶13; Majority, ¶10. In both cases, WVA appealed the dismissal orders and narrowed its dispute with the county registers to whether the NVE forms are exempt from disclosure under the Public Records Law. *See* ***Reynolds***, ___ Wis. 2d ___, ¶7; Majority, ¶10.

¶73 The majority's attempts to distinguish the "procedural posture of ***Reynolds***" are wholly unconvincing. Majority, ¶3 n.2. First, the majority notes that in ***Reynolds***, the register in probate raised two grounds for dismissal in the circuit court: (1) WVA's failure to comply with WIS. STAT. § 801.02(5), and (2) the "alternative" ground of failure to state a claim on which relief could be granted. Majority, ¶3 n.2. But Secord made the same two arguments in her motion to dismiss in the present case, so there is no difference between the two cases in that respect.

¶74 Next, the majority states that the circuit court in ***Reynolds*** dismissed WVA's petition before WVA filed its opposition to Reynolds' motion to dismiss. Majority, ¶3 n.2. Admittedly, that did not happen in the present case: WVA filed a brief opposing Secord's motion to dismiss before the circuit court granted Secord's motion. Why is that difference relevant or meaningful? The majority suggests that it left us in ***Reynolds*** without "a fully briefed, fully argued underlying case" and caused that appeal to "diverge[]" from this one. ***Id.*** This explanation does not hold water. ***Reynolds*** controls here because the parties in that case raised the same issues that are raised in this case. The majority

3

acknowledges that this is the key question, Majority, ¶3 n.4 ("The question is whether the issues vary."), but it gives the wrong answer.[4]

¶75    Finally, the majority claims that unlike in the present case, the circuit court in **Reynolds** did not afford WVA an opportunity to "refine its request or to explain or defend its petition."  Majority, ¶6 n.6.  This appears to be another reference to the fact that the circuit court in **Reynolds** dismissed WVA's complaint before WVA filed a brief opposing Reynolds' motion, which as explained above is not a meaningful distinction between **Reynolds** and this case.

### B.  *Reynolds* is substantively indistinguishable from this case.

¶76    Because **Reynolds** and this case are procedurally indistinguishable and involve identical public records requests submitted by the same parties to registers in probate, **Reynolds** controls here and we are bound to follow it.  The majority attempts to sidestep this obligation by claiming that its disagreement with **Reynolds** is confined to Judge Lazar's concurring opinion.  Majority, ¶3.  This is not true.  **Reynolds** reached multiple binding holdings that the majority opinion directly contravenes.

¶77    **Reynolds** concluded that the NVE forms sought by WVA in this case are confidential under WIS. STAT. § 54.75.  It reached this conclusion by determining that the forms are, in the words of the first sentence of that statute,

_____

[4] The majority's declaration that **Reynolds** only decided one of the three issues it identifies as raised here is simply not accurate.  Nor is its assertion that Secord "focuses her entire argument" on the second sentence of WIS. STAT. § 54.75 in assessing whether the NVA forms are subject to disclosure.  Majority, ¶30.  The issues presented by WVA in its attempt to access the same NVA forms under the same statutes from a register in probate are the same; the majority simply attempts to distinguish them by ignoring the applicable statutes and precedent issue by issue.

"court records pertinent to the finding of incompetency." ***Reynolds***, ___ Wis. 2d ___, ¶28; Sec. 54.75. This renders the forms "closed" to public access under § 54.75. ***Reynolds***, ___ Wis. 2d ___, ¶26. ***Reynolds*** also determined that the exception set forth in the second sentence of § 54.75, which permits disclosure of two discrete pieces of information—(1) "[t]he fact that an individual has been found incompetent" and (2) "the name of and contact information for" the individual's guardian—to a "person who demonstrates … a need for that information," does not apply to the NVE forms because they are not "the information referenced in this sentence." ***Reynolds***, ___ Wis. 2d ___, ¶33 & n.9. In addition, ***Reynolds*** rejected WVA's suggestion that the Wisconsin Election Commission's (WEC) receipt of NVE forms following a circuit court's determination that a ward's right to vote or to register to vote should be restricted "might take the form outside the 'closed' status established by … § 54.75." ***Reynolds***, ___ Wis. 2d ___, ¶32. The consequence of our statutory analysis in ***Reynolds*** is the NVE forms are categorically exempt from disclosure under WIS. STAT. § 19.36(1) of the Public Records Law, and thus, the balancing test in which the public's interest in favor of disclosure is weighed against the public interest against disclosure does not apply. ***Reynolds***, ___ Wis. 2d ___, ¶¶22, 34 n.10; *see also* ***Watton v. Hegerty***, 2008 WI 74, ¶¶27-28, 311 Wis. 2d 52, 751 N.W.2d 369.

¶78 On each of these points, the majority reaches the exact opposite conclusion. Contrary to ***Reynolds***, the majority concludes that the NVE forms *are* subject to release under WIS. STAT. § 54.75. Majority, ¶4. Without analyzing the holding of ***Reynolds***, or the language of the statutory exception, the majority counters that the second sentence of § 54.75 *does* apply to the forms, and simply skips to its conclusion that WVA has demonstrated a "need" for the forms. Majority, ¶4. The majority goes on to wholly ignore ***Reynolds***' explicit rejection

of an argument based on the fact that the forms are sent to WEC and *Reynolds*' holding that the forms in the guardianship case files are "closed" to public access under § 54.75. Majority, ¶29. And finally, the majority applies the balancing test, concludes that the public interest in disclosure of the forms outweighs the public's interest in preserving the confidentiality of guardianship records, and largely rests its decision to reverse the circuit court's order on that balance of interests. *Id.*, ¶¶14-16, 19, 40. Each of these conclusions is in direct conflict with *Reynolds*.

## II. The Majority's Reinvention of Public Records Law Analysis is Legally Unsound.

¶79 The majority's analysis largely rests on its application of a public interest balancing test. It does so despite *Reynolds*' holding that NVE forms sought by WVA in this case are confidential under WIS. STAT. § 54.75 and therefore categorically exempt from disclosure under the Public Records Law. *See* WIS. STAT. § 19.36(1) ("Any record which is specifically exempted from disclosure by state or federal law or authorized to be exempted from disclosure by state law is exempt from disclosure under [WIS. STAT. §] 19.35(1) …."). The consequences of the majority's analysis, which enables one circuit court or two appellate judges to engage in public policy analysis and override statutory exceptions for confidential, privileged, or otherwise exempt records cannot be overstated. The majority's disregard for well-established precedent and the plain language of § 19.36(1) exempting legislative designations of confidential or otherwise exempt records, amounts to and invites unchecked judicial activism.

¶80 As *Reynolds* recognized, prior cases under the Public Records Law have developed a multi-step test for determining the accessibility of records. In the first step, courts determine whether the Public Records Law applies to the items at issue. *Democratic Party of Wis. v. DOJ*, 2016 WI 100, ¶10, 372 Wis. 2d

6

460, 888 N.W.2d 584.  To answer that question, a court must first assess whether the items are "records" as defined in WIS. STAT. § 19.32(2).  *See Linzmeyer v. Forcey*, 2002 WI 84, ¶15, 254 Wis. 2d 306, 646 N.W.2d 811.  If they are, the statutory presumption of accessibility codified in WIS. STAT. § 19.31 applies.  *Democratic Party*, 372 Wis. 2d 460, ¶10.[5]

¶81    That presumption, however, "does not create an absolute right of access."  *Watton*, 311 Wis. 2d 52, ¶10.  Instead, a requester who seeks access to public records has the right to inspect them "[e]xcept as otherwise provided by law."  WIS. STAT. § 19.35(1)(a).  Thus, the next step in the analysis requires a court to determine whether "a specific statutory exemption to disclosure" or "a common law or public policy exception" prevents disclosure.  *Watton*, 311 Wis. 2d 52, ¶¶9-10.  WISCONSIN STAT. § 19.36 contains several such exemptions.  "For the types of records described in [§ 19.36], the legislature has determined that they are categorically exempt from disclosure to the public."  *Voces De La Frontera, Inc. v. Clarke*, 2017 WI 16, ¶20, 373 Wis. 2d 348, 891 N.W.2d 803.

¶82    Relevant here, WIS. STAT. § 19.36(1) provides that "[a]ny record which is specifically exempted from disclosure by state or federal law or authorized to be exempted from disclosure by state law is exempt from disclosure

---

[5] The majority trumpets its decision as a vindication of Wisconsin's commitment to open and transparent government, Majority, ¶4 n.5, but it fails to identify *a single case* in which the judiciary has compelled disclosure notwithstanding an applicable statutory exemption.  The majority has failed to identify *a single case* in which a court has engaged in a public records balancing test in the face of a statutory exemption.  To the contrary, the cases the majority cites recognize that the right of public access is not absolute and will yield where that result is required by an explicit statutory exception to access.  *See, e.g.*, *Watton v. Hegerty*, 2008 WI 74, ¶10, 311 Wis. 2d 52, 751 N.W.2d 369 ("[T]he presumption of access does not create an absolute right of access.  Access to records may be denied where there is a specific statutory exemption to disclosure, WIS. STAT. § 19.36, or where there is a common law or public policy exception.").

under [WIS. STAT. §] 19.35(1)." Importantly, if this or any other exemption or exception applies to the records, "the analysis ends and the records will not be disclosed." ***Democratic Party***, 372 Wis. 2d 460, ¶11. If, however, no exemption or exception applies, the court proceeds to the final step, in which it balances the public interest in favor of disclosure against the public interest opposing disclosure. ***Milwaukee J. Sentinel v. DOA***, 2009 WI 79, ¶¶54-55, 319 Wis. 2d 439, 768 N.W.2d 700; ***Linzmeyer***, 254 Wis. 2d 306, ¶24.

¶83 The Wisconsin Supreme Court has made clear that courts are not to weigh the interests for and against disclosure unless and until they determine that no statutory, common law, or public policy exception categorically exempts a record from disclosure. *See, e.g.*, ***Hempel v. City of Baraboo***, 2005 WI 120, ¶4, 284 Wis. 2d 162, 699 N.W.2d 551. In ***Watton***, for example, our supreme court held that statements of emergency detention possessed by a police department were exempted from disclosure by several statutes within Wisconsin's Mental Health Act, WIS. STAT. ch. 51. ***Watton***, 311 Wis. 2d 52, ¶20. Because the court determined that these statutes prohibited disclosure of the statements, the court did not "address Watton's argument that the balance of interests between Wisconsin's policy of open government and Gray's interests in keeping his mental health records private tips in favor of disclosure." ***Id.***, ¶28. The existence of a statutory exemption was the *end* of the analysis. *See also* ***Voces De La Frontera***, 373 Wis. 2d 348, ¶44 (concluding that records were "statutorily exempt from disclosure under Wisconsin public records law" and thus declining to "reach the … balancing test").

¶84 A year after ***Watton***, in ***Milwaukee Journal Sentinel***, the supreme court examined a collective bargaining agreement between the State and the Wisconsin State Employees Union which contained a provision prohibiting the

State from disclosing certain information related to individuals represented by the union to the press and others. 319 Wis. 2d 439, ¶5. There, the court concluded that the legislature's ratification of the agreement did not, by itself, create an exception to the Public Records Law. *Id.*, ¶54. Only after reaching that conclusion did the court apply the balancing test to determine whether the union-represented individuals' information had to be disclosed. *Id.*; *see also **Linzmeyer***, 254 Wis. 2d 306, ¶24 (analyzing balance of interests only after concluding that no exemptions prevented disclosure of report).

¶85 The majority's analysis upends this well-established analytical path. The majority begins its discussion with the interest-balancing, asserting that it must weigh "an individual citizen's rights to privacy in a matter of utmost importance to the individual's dignity" against "the right of every Wisconsin citizen to the constitutional guarantee of fair elections." Majority, ¶14. The majority then declares that the balance tips in favor of ensuring election integrity, concluding that "[e]very citizen of this state has the right" to know who is responsible for the purported error WVA has uncovered "because left unaddressed, it risks each citizen's right to have his or her vote counted in the

course of a fair election." *Id.*, ¶19. Thus, WVA has prevailed before the statutory analysis even begins.[6]

¶86     When the majority does reach the statute, its blink-and-you'll-miss-it analysis is incomplete. The majority begins by noting that no party disputes that the NVE form is a "record" under WIS. STAT. § 19.32(2). Majority, ¶25. And … that's about it. The majority recognizes the three categories of exceptions to disclosure, *id.*, ¶26, including statutory exceptions, but asserts that "[n]o statutory exception" applies. *Id.*, ¶28. But there is no analysis underlying that conclusion, no mention of the statutory exception in WIS. STAT. § 19.36(1) for records exempted from disclosure by state law, and no explanation why WIS. STAT. § 54.75 does not constitute such a state law. Again, all in direct conflict with *Reynolds*. Instead, the majority briefly delves back into the balance of interests for and against disclosure, Majority, ¶¶28-29, before concluding with a review of

---

[6] What's more, the majority's approach to the interest-balancing is not consistent with Wisconsin law. The Wisconsin Supreme Court has instructed that the balancing test "must be applied with respect to each individual record." *Milwaukee J. Sentinel*, 319 Wis. 2d 439, ¶56; *see also* *Wisconsin State J. v. Blazel*, 2023 WI App 18, ¶60, 407 Wis. 2d 472, 991 N.W.2d 450. No such individualized, form-by-form consideration appears in the majority opinion. Perhaps this is not surprising: the circuit court did not engage in that individualized inquiry because it concluded that the NVE forms were categorically exempt from disclosure under WIS. STAT. § 54.75. In the context of discussing the mandamus factors, the circuit court did determine that WVA's stated need was speculative. The majority ignores the circuit court's conclusion and jumps into the balancing analysis for itself. This is significant because, as explained in footnote eight of this dissent, the record contains no facts showing election integrity has been compromised in Walworth County.

the four requirements for mandamus relief. *Id.*, ¶¶31-34.[7] This reasoning bears no resemblance to the framework set out in *Democratic Party*, *Watton*, and countless other public records cases. Thus, the majority's analysis is in direct conflict with *Reynolds* and the statutory exemption at issue here, as well as WIS. STAT. ch. 19 and well-established public records cases.

### III. The Majority's Reliance on the "Need" Exception Also Ignores *Reynolds* and the Statutory Language of WIS. STAT. § 54.75.

¶87 The majority also addresses, in a separate section, WVA's "alternative" argument that it has shown a "public need" for the NVE forms. Majority, ¶¶35-40. As noted above, the majority's conclusion that WVA is entitled to the NVE forms cannot be reconciled with *Reynolds* and the text of WIS. STAT. § 54.75. The statute permits the disclosure of two pieces of information upon a showing of need—(1) "[t]he fact that an individual has been found incompetent" and (2) "the name of and contact information for" the individual's guardian. *Id.* As *Reynolds* recognized, information regarding an individual's eligibility to vote or register to vote is not accessible under this very limited exception. *Reynolds*, ___ Wis. 2d ___, ¶33 & n.9. Nor is almost all of the other information that is displayed on the NVE form, such as the ward's date of birth,

---

[7] Before it addresses the mandamus factors, the majority accuses Secord of failing to "give appropriate attention" to the portion of the first sentence in WIS. STAT. § 54.75 which states that "court records pertinent to the finding of incompetency" are "subject to access … under an order of the court under this chapter." Majority, ¶30. The majority does not explain why this portion of the statute merits attention, but to the extent the majority believes that it provides a path for WVA to obtain the NVE forms in this lawsuit, it is mistaken. WVA's petition in this action seeks a writ of mandamus to compel the disclosure of records under Wisconsin's Public Records Law, which is contained in Chapter 19 of the Wisconsin Statutes. Section 54.75, in contrast, permits access to guardianship records pursuant to an order issued "under this chapter"—WIS. STAT. ch. 54. A writ of mandamus issued under ch. 19 is not an order issued under ch. 54. Thus, the first sentence in § 54.75 is not a viable path to obtain the NVE forms.

11

the guardianship case number and the date the ward was declared incompetent. The majority's analysis fails to address what § 54.75 actually allows to be disclosed upon a showing of need and makes no attempt to explain how the NVE form or the information displayed on the form fits within that narrow category.[8]

---

[8] While **Reynolds** is dispositive regarding the applicability of the exception in the second sentence of WIS. STAT. § 54.75, I note that, even if the fact that an individual had been found incompetent could be disclosed on a showing of need, WVA's petition fails to make that showing.

According to the majority, WVA "asserts it has an interest in seeing that the voter rolls in Wisconsin are accurate so that our elections comport with constitutional guarantees." Majority, ¶36. But WVA's petition does not plausibly allege any inaccuracy in the voter rolls, particularly as it pertains to individuals in Walworth County. As the circuit court noted, WVA does not allege that any person in Walworth County who is ineligible to vote as the result of being placed under a guardianship has voted illegally or even been sent a ballot. (The only occurrence of such behavior noted in the petition pertained to an individual in Outagamie County.) And WVA concedes it has no evidence that Secord is not sending NVE forms to WEC when the Walworth County Circuit Court places an individual under guardianship and finds them to be incapable of exercising the right to vote or to register to vote.

Lacking such evidence, WVA relies entirely on the alleged difference between the number of individuals adjudicated as incompetent and placed under guardianships in Walworth County from 2016 through 2021 (157) and the number of persons from Walworth County who were listed as ineligible to vote in the database of voter registration information as of an unspecified date (1). That difference does not show a need to pry open Walworth County's guardianship files. As Secord informed WVA in her June 24, 2022 letter, the year-by-year totals of adjudicated incompetents from 2016-2021

> <u>do</u> <u>not</u> differentiate between individuals who have retained rights and those who have had rights restricted. **_Individuals could be found incompetent and retain their right to vote_**, marry, serve on a jury, and many other rights outlined in § 54.25(2), Wis. Stats. Every finding of incompetency is not an automatic loss of voting rights.

It is just as likely that many, if not most, of the persons placed under guardianship in Walworth County did not have their right to vote restricted. It is also possible that some of those individuals are no longer alive, no longer reside in Walworth County, or have since had their right to vote restored. As the circuit court aptly found, to contend that there is a "discrepancy" is entirely speculative. In short, the majority can point to **_no facts_** to show that there is a discrepancy or any wrongful voting in Walworth County.

¶88    If, as the majority professes, *Cook* requires us to follow *Reynolds*, then we must do so.  Aside from that being our duty as judges, it is obviously the wiser course of action.  What are the circuit courts presiding over WVA's other mandamus actions, and the parties in those actions, supposed to do after today? *Reynolds* tells them the NVE forms are not subject to disclosure under WIS. STAT. § 54.75, and therefore WVA is not entitled to a writ of mandamus compelling their disclosure.  Today, the majority tells those same courts and litigants the exact opposite.  They are now faced with an impossible situation:  they cannot follow both *Reynolds* and this case.  In creating this state of affairs, the majority brings about the undesirable consequences foreshadowed in *Cook*:  a fracturing of this court and an undermining of "the principles of predictability, certainty and finality relied upon by litigants, counsel and the circuit courts." *See Cook*, 208 Wis. 2d at 189.

¶89    We do a disservice to the bench, the bar, and the public when we unnecessarily create such conflict and uncertainty.  In its headlong rush to climb up and "walk[] [the] tightrope," Majority, ¶15, between preserving the confidentiality of guardianship proceedings and ensuring electoral integrity, the majority ignores the more modest and prudent paths at its feet that were illuminated by *Cook*:

> The court of appeals, however, is not powerless if it concludes that a prior decision of the court of appeals or the supreme court is erroneous.  It may signal its disfavor to litigants, lawyers and this court by certifying the appeal to this court, explaining that it believes a prior case was wrongly decided.  Alternatively, the court of appeals may decide the appeal, adhering to a prior case but stating its belief that the prior case was wrongly decided.

*Cook*, 208 Wis. 2d at 190.  The majority's failure to follow the binding precedent set forth in *Reynolds* and disregard of the analytical framework developed to

13

address public records claims is an unprecedented choice with far-reaching implications for the rule of law in Wisconsin.

## IV.    The Concurrence's Statutory Interpretation is Flawed.

¶90    I conclude by addressing the concurrence, which analyzes whether the NVE forms are "court records pertinent to the finding of incompetency" and thus "closed" to public access under WIS. STAT. § 54.75.  In my view, **Reynolds** sets forth a more persuasive analysis of this statutory language, in particular the meaning of the word "pertinent."  Thus, I agree with **Reynolds'** conclusion that the forms are "pertinent to the finding of incompetency."  *See **Reynolds***, ___ Wis. 2d ___, ¶28.  I address the concurrence to highlight what are, in my view, three errors in its statutory analysis.

¶91    First, a significant factor that leads the concurrence to conclude that NVE forms are not pertinent to the finding of incompetency is its belief that transmission of the forms from the circuit court to WEC makes the forms, and the information contained on them, publicly available.[9]  Concurrence, ¶42.  The concurrence contends that "voter eligibility communications are expressly designed to be made public," *id.*, ¶45; that a circuit court, upon finding an individual incompetent, "communicates that publicly … to WEC" via the NVE form, *id.*, ¶55; and that the form itself "put[s] WEC, the viewers of WisVote, and all voting precincts on notice that an individual has been declared incompetent," *id.*

---

[9] This belief also drives the majority's balancing of interests and "need" analyses. Majority, ¶29.

¶92 The concurrence's view runs contrary to our conclusion in *Reynolds* that "the confidentiality of an NVE form contained in a circuit court file is not affected by WEC's treatment of a duplicate of the same form." ___ Wis. 2d ___, ¶32. The concurrence loses sight of the fact that the request at issue here seeks to compel disclosure of the NVE forms contained in the guardianship files of the register of probate, not WEC.

¶93 Next, in construing the phrase "pertinent to the finding of incompetency" in WIS. STAT. § 54.75, the concurrence relies significantly on several defamation cases to support its conclusion that the statutory language only extends to "information, data, and testimony that is referenced in the judicial proceedings and leads up to the court-ordered adjudication." Concurrence, ¶¶45-47, 52. Those defamation cases do not provide meaningful guidance in determining the scope of "pertinent" in § 54.75. In those cases, our supreme court considered whether the plaintiffs had stated viable defamation claims, which were premised on statements made in the course of judicial proceedings. *See Schultz v. Strauss*, 127 Wis. 325, 328-29, 106 N.W. 1066 (1906) (assessing viability of defamation claim premised on a statement made during grand jury proceeding); *Bussewitz v. Wisconsin Teachers' Ass'n*, 188 Wis. 121, 123-25, 205 N.W. 808 (1925) (examining defamation claim premised on a statement made in counterclaim). To assess the claims' viability, the court had to determine whether the statements at issue were "pertinent and related to the subject of inquiry" in the proceedings because if they were, they could not be the basis for a defamation claim. *See Schultz*, 127 Wis. at 328-29 ("It is well recognized by numerous adjudications 'that words spoken in the course of judicial proceedings, though they are such as impute crime to another, and therefore if spoken elsewhere, would

15

import malice and be actionable in themselves, are not actionable if they are applicable and pertinent to the subject of inquiry.'" (citation omitted)).

¶94    The statements at issue in *Schultz* and *Bussewitz* were necessarily made in the course of judicial proceedings because the litigation privilege would not have been relevant had they been made outside the proceedings or after they had concluded.  Thus, these cases, and the others cited by the concurrence, specifically address the relevance of what takes place during a judicial proceeding—defamatory remarks or evidentiary determinations–and have nothing to do with whether an NVE form that is completed and sent to WEC after a finding of incompetency has been made is nonetheless "pertinent to" that finding. And, as *Reynolds* aptly points out, WVA's attempt (embraced by the concurrence) to cabin "pertinent to the finding of incompetency" to the facts supporting the competency determination set forth during the proceeding, "transforms the language into something along the lines of 'pertinent to the facts supporting the finding of incompetency,'" which is not what WIS. STAT. § 54.75 says.  *Reynolds*, ___ Wis. 2d ___, ¶30 n.8.

¶95    Finally, the concurrence faults *Reynolds* for not construing the term "pertinent" "in the context of the entire phrase in which it is used" in WIS. STAT. § 54.75—"pertinent to the finding of incompetency."  Concurrence, ¶66.  That, in my opinion, ignores several key paragraphs in *Reynolds*.  In that case, we consulted several dictionary definitions of the word "pertinent," and then considered those definitions with the rest of the statutory language.  *Reynolds*, ___ Wis. 2d ___, ¶¶28-30.  In paragraphs twenty-eight to thirty of *Reynolds*, we plugged the dictionary definitions of "pertinent" into the language of § 54.75 and explained why the NVE forms "'hav[e] some connection with' and 'relat[e] to,' the finding of incompetency."  *Reynolds*, ___ Wis. 2d ___, ¶¶28-30 (citation

16

omitted). That is so, **Reynolds** states, because the forms are "created in the context of proceedings in which incompetency is determined for purposes of establishing guardianship," *id.*, ¶28; "contain[] information drawn directly from the guardianship proceedings," *id.*, ¶29; and were "the standard means of making a statutorily required report of the circuit court's determination regarding restrictions to an individual's voting rights as a result of the court's finding of incompetency in a guardianship proceeding," *id.*, ¶30. The analysis in these paragraphs is what the concurrence incorrectly claims **Reynolds** lacks.[10]

\*\*\*\*

¶96 No one disputes the important interest in ensuring that only those who are eligible to vote in Wisconsin elections are able to cast a ballot. As a state, we are well-served when government and the public work to make sure our elections are run with fairness, integrity, and fidelity to the law. Nor do I disagree with the majority that Wisconsin law embodies a strong commitment to allowing the public access to the workings of government. But the importance of these interests is not a license to trample or disregard other important aspects of

---

[10] Equally unavailing, after reviewing a handful of irrelevant cases, several ancient, the concurrence declares that "all of the legal authorities, all of the cases, and all of the dictionary definitions" support its attempt to cabin "pertinent" to facts considered during a judicial proceeding. Concurrence, ¶57. Again, WIS. STAT. § 54.75 does not limit its reach to facts supporting the finding of incompetency, or to findings of incompetency. The concurrence's analysis adds words and ignores the plain language of the statute: all records pertinent to the finding of incompetency are confidential.

17

Wisconsin law. Today the majority does just that.[11] It fails to adhere to precedent and to apply the well-established analysis that governs Public-Records-Law claims. It purports to vindicate the interest in ensuring voting integrity even though WVA has presented no evidence of irregularities in Walworth County. And it compels the disclosure of confidential court records expressly exempted from disclosure by statute. Because I do not agree with the majority's analysis or conclusion, I respectfully dissent.

---

[11] The majority's flawed public policy analysis appears to be driven by its belief that the legislature should not have afforded confidential status to wards and, without any factual support, that the statutory reporting system to local election officials risks error. The proper route to address such matters is through the legislature. *See State v. Pocian*, 2012 WI App 58, ¶12, 341 Wis. 2d 380, 814 N.W.2d 894; *Meriter Hosp., Inc. v. Dane County*, 2004 WI 145, ¶35, 277 Wis. 2d 1, 689 N.W.2d 627 ("If a statute fails to cover a particular situation, and the omission should be cured, the remedy lies with the legislature, not the courts." (citation omitted)). Recognizing this to be the case, several bills have been proposed to address the reporting system, including a proposal to require prompt reporting of a determination of incompetency to vote to WEC by email, as well as to local officials, to ensure that these individuals are identified as ineligible. *See, e.g.*, 2023 A.B. 567. I do not highlight these pending bills, as the majority suggests, to suggest that we refrain from deciding this case until they are enacted into law. Majority, n.20. I do so to illustrate the point that, given the relevant statutes as they currently exist, it is the legislature's role, not this court's, to devise a remedy for the issues WVA claims to have uncovered. Whether such proposals are enacted or not, as discussed herein, the majority overrides the current statutes to craft its own approach, and makes public personal, sensitive, and confidential information of individuals who have complied with the law, so that WVA can do a comparison to the public voter database.